Affirmed and Memorandum Opinion filed January 26,
2010.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00633-CV

____________

 

GENERAL INSULATION COMPANY, Appellant

 

V.

 

DANIEL L. KING, Appellee

 



 

On Appeal from the 234th
District Court

Harris County, Texas

Trial Court Cause No. 2006-71028

 



 

M E M O R A N D U M   O P I N I O N

In this misappropriation-of-trade-secrets
and breach-of-contract case, appellant General Insulation Company (AGeneral@) appeals from the
trial court=s summary judgment in favor of appellee Daniel L.
King.  Determining King conclusively negated at least one essential element of
each of General=s causes of action, we affirm.

I








General sells insulation materials to
mechanical and plumbing contractors.  King, after approximately ten years with
Specialty Products and Insulation (ASPI@), began working
for General in January 2005, first as the assistant branch manager then as
branch manager in its Houston office.  At the beginning of his employment with
General, King signed an AAgreement Concerning Propriety Information@ (Athe Agreement@).  The Agreement
provided in part:

CONFIDENTIALITY

With respect to the information,
projects, practices, customer contacts, potential customers, methodologies and
management philosophy relating to COMPANY, and also with respect to all other
information, whatever its nature and form and whether obtained orally, by
observation, from graphic materials, or otherwise (except such as is generally
available by publication) obtained by me during or as a result of my employment
by the COMPANY and relating to any product, process, or apparatus or to any use
of any of them, or to materials, tolerances, specifications, costs (including
manufacturing costs), prices or to any plans of COMPANY or any subsidiary
thereof, I agree:

A.      to hold all
such information, projects, practices, customer contacts, potential customers,
methodologies, process, apparatus, costs (including manufacturing costs), prices,
plans and management philosophy in strict confidence and not in publish or
otherwise disclose any thereof except with the prior consent of an authorized
representative of the COMPANY;

. . . .

D.      . . . upon
request of the COMPANY to deliver to it all graphic materials, reports,
computer disks and the like containing or relating to any such information,
projects, practices, customer contacts, potential customers, methodologies,
process, apparatus, costs (including manufacturing costs), prices, plans and
management philosophy . . . .

CONTINUING OBLIGATION

My obligations under this Agreement
hereof shall remain in effect throughout my employment by the Company, and ever
thereafter . . . .

 








On September 5, 2006, King informed
General he was resigning.  At that time, King told General=s operations
manager, Ann Shirey, that he had already packed, having retrieved his
belongings the previous Saturday.  Shortly after King left the premises, Shirey
inventoried King=s office. She observed that certain
documents, such as the price book that had previously been in King=s office, were no
longer there.  According to Shirey, there was Aquite a bit
missing,@ including King=s telephone files
and his customer-contact list.

Shortly after leaving General, King began
working as division manager for Bay Insulation Systems of Texas, Inc. (ABay@), a competitor of
General.  According to Shirey, General became aware King was providing quotes
to General=s customers for insulation material from Bay.  Shirey
testified General=s quotes and the quotes King made to
clients on behalf of Bay were Awithin pennies of each other per item.@  She also
testified that, before King=s departure from General, one of General=s customers,
Houston Insulation, had not done any business with Bay.  After King left
General, however, Bay began to do business with Houston Insulation, and General
lost projects to Bay that it would otherwise have received from Houston
Insulation.  Additionally, a number of General=s other customers
that had not done any or much business with Bay before King=s departure to
Bay, began doing business with Bay.

In November 2006, General sued King,
seeking damages and injunctive relief for Awrongful use of
confidential information under common law@ (misappropriation
of trade secrets) and for breach of contract.  The confidential and proprietary
information on which General based its claims included its customer-contact
lists and its pricing formulas and schedules.

King moved for partial summary judgment on
General=s claims.  King
contended his proof conclusively established he did not take the information in
question and that neither the customer lists nor the pricing information was
confidential, proprietary, or a trade secret.  King=s summary-judgment
proof consisted of his affidavit and the depositions of Shirey and another
General regional manager, Mark Snodgrass.  General responded.  Its
summary-judgment proof consisted of excerpts from Shirey=s and Snodgrass=s depositions and
exhibits from King=s deposition.








The trial court granted King=s motion for
partial summary judgment and ordered that General=s claims against
King be dismissed with prejudice.  The court subsequently entered final
judgment disposing of all claims.[1]

II

In a single issue, General argues the
trial court erred in granting King=s motion for
traditional summary judgment.  We review the trial court=s grant of summary
judgment de novo.  Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150,
156B57 (Tex. 2004). 
In a traditional summary judgment, the movant bears the burden to show there is
no genuine issue of material fact and that it is entitled to judgment as a
matter of law. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt. Co.,
690 S.W.2d 546, 548B49 (Tex. 1985); Aguirre v. Vasquez,
225 S.W.3d 744, 750 (Tex. App.CHouston [14th Dist.] 2007, no pet.). 
Thus, when a defendant moves for traditional summary judgment, he must
conclusively negate at least one essential element of each of the plaintiff=s causes of action
or conclusively establish each element of an affirmative defense.  Sci.
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997);  Shirvanian
v. DeFrates, 161 S.W.3d 102, 106 (Tex. App.CHouston [14th
Dist.] 2004, pet. denied).

We take as true all evidence favorable to
the non‑movant, and we indulge every reasonable inference and resolve any
doubts in the non‑movant=s favor.  Joe, 145 S.W.3d at 157; Aguirre,
225 S.W.3d at 750.  We review a summary judgment for evidence that would enable
reasonable and fair‑minded jurors to differ in their conclusions.  Wal‑Mart
Stores, Inc. v. Spates, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam)
(citing City of Keller v. Wilson, 168 S.W.3d 802, 822 & 23 (Tex.
2005)).








When, as here, the trial court does not
specify in its order the grounds on which it relied in granting summary
judgment, we must affirm the summary judgment if any of the grounds presented
has merit.  W. Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005); Chappell
Hill Bank v. Smith, 257 S.W.3d 320, 324 (Tex. App.CHouston [14th
Dist.] 2008, no pet.).  Thus, to prevail on appeal, General must show that each
of King=s summary‑judgment
grounds is meritless.  See Star‑Telegram, Inc. v. Doe, 915 S.W.2d
471, 473 (Tex. 1995).

In the present case, General pleaded two
claims: (1) common-law misappropriation of trade secrets and other confidential
information; and (2) breach of the Agreement.  General based both claims on
King=s alleged
disclosure or use of two types of informationCclient-contact
information and pricing information specific to individual clients.[2] 
In his summary-judgment motion, King argued two grounds in relation to each of
these claims: (1) King did not take or misappropriate any information; and (2)
the information in question was not confidential or proprietary under the
Agreement and not a Atrade secret.@

III

In the following discussion, we first set
forth the elements of each of General=s causes of
action.  We then consider King=s summary-judgment motion and proof as it
relates to each of the two types of informationCthe client
contacts and the customer-specific pricing data.

A








Misappropriation
of trade secrets.  The elements of a common-law misappropriation claim are:
(1) existence of a trade secret; (2) breach of a confidential relationship or
improper discovery of a trade secret; (3) use of the trade secret; and (4)
damages.  Trilogy Software, Inc. v. Callidus Software, Inc., 143 S.W.3d
452, 463 (Tex. App.CAustin 2004, pet. denied).  Before there
can be a Atrade secret,@ there must be a
substantial element of secrecy.  Id. at 467.  Factors relevant to
determining whether a trade secret exists include (1) the extent to which the
information is known outside the party=s business, (2)
the extent to which it is known by employees and others within the business,
(3) the extent of measures taken by the party to guard the secrecy of the
information, (4) the value of the information to the business and its
competitors, (5) the amount of effort or money expended to develop the
information, and (6) the ease or difficulty with which the information could be
properly acquired or duplicated by others.  In re Lowe=s Cos., 134 S.W.3d 876,
878 (Tex. App.CHouston [14th Dist.] 2004, orig. proceeding) (citing In
re Bass, 113 S.W.3d 735, 739 (Tex. 2003)).

Breach of
contract.  The essential elements of a breach-of-contract claim
are:  (1) the existence of a valid contract;  (2) the plaintiff performed or
tendered performance;  (3) the defendant breached the contract;  and (4) the
plaintiff was damaged as a result of the breach.   Aguiar v. Segal, 167
S.W.3d 443, 449 (Tex. App.CHouston [14th Dist.] 2005, pet. denied). 
A breach occurs when a party fails or refuses to do something it has promised
to do.  Townewest Homeowners Ass=n, Inc. v. Warner
Commc=n Inc., 826 S.W.2d 638, 640 (Tex. App.CHouston [14th
Dist.] 1992, no writ).  In the Agreement on which General based its
breach-of-contract claim, King promised, among other matters, to Ahold . . . in
strict confidence and not publish or otherwise disclose@ certain types of
information, including Acustomer contacts, potential customers . .
. [and] prices,@ which he Aobtained . . .
during or as a result of [his] employment@ by General, but
excepting such information Aas is generally available through
publication.@

B

Customer contacts.  General concedes
its list of customers is not confidential.  The information at issue is instead
the specific contact persons for each customer.








The Agreement applied only to information
King Aobtained . . .
during or as a result of [his] employment@ by General. 
Similarly, in relation to misappropriation of trade secrets, A[t]he general rule
is that confidential information received during the course of fiduciary
relationships may not be used or disclosed to the detriment of the one from
whom the information is obtained.@  Numed, Inc.
v. McNutt, 724 S.W.2d 432, 434 (Tex. App.CFort Worth 1987,
no writ) (emphasis added); see Miller Paper Co. v. Roberts Paper Co.,
901 S.W.2d 593, 600 (Tex. App.CAmarillo 1995, no writ) (referring to dutyCarising apart from
any written contractCwhich forbids an employee from using
confidential or proprietary information acquired during the relationship in
manner adverse to his employer).

In his affidavit, King attested that,
before beginning employment with General, he had worked for SPI for
approximately ten years.  He listed nine specific customers who he had learned
of while working at SPI.  He then stated:

Additionally, I became
personally acquainted with numerous persons working at many potential
insulation customers within the Houston insulation market.  As a result of
these acquaintances I was aware of employees at each of the [nine previously
listed] potential insulation customers . . . that had purchasing authority for
such entities before I ever went to work for General Insulation.  I was also
personally acquainted with persons serving as the customer contacts, with
purchasing authority at each of the [nine previously listed] entities . . . as
of September 15, 2006.  I made these personal acquaintances before I went to
work for General Insulation.

 

General contends King=s affidavit cannot
support summary judgment for King because it is the testimony of an interested
witness.  AA summary judgment may be based on uncontroverted
testimonial evidence of an interested witness . . . if the evidence is clear,
positive and direct, otherwise credible and free from contradictions and
inconsistencies, and could have been readily controverted.@  Tex. R. Civ. P.
166a(c).[3] 
On its face, King=s testimony regarding the source of his
knowledge of the customer contacts is clear, positive and direct, otherwise
credible and free from contradictions and inconsistencies.








ACould have been
readily controverted@ does not mean a party could have easily
and conveniently rebutted the summary-judgment proof, but rather indicates a
party could have effectively countered the testimony with opposing evidence.  Trico
Techs. Corp. v. Montiel, 949 S.W.2d 308, 310 (Tex. 1997).  If King=s representations
about the sources of his information were untrue, General could have readily
controverted King=s testimony with affidavits or deposition
testimony from SPI personnel or from representatives of the nine listed
companies.  General did not present such evidence.[4]

King=s uncontroverted
testimony that he obtained the customer-contact information from sources other
than his employment with General supports traditional summary judgment in favor
of King on General=s misappropriation-of-trade-secrets and
breach-of-contract claims based on the customer-contact information.

Customer-specific
pricing.  The pricing information at issue is Ajob pricing,@ i.e., the
specific pricing information quoted to a specific customer for a specific job. 
King presented two summary-judgment grounds in relation to this information:
(1) he did take any customer-specific pricing information from General; and (2)
the customer-specific pricing information was not confidential.  To gain
reversal of the summary judgment on either cause of action based on the
customer-specific pricing information, General must prove each of these grounds
is meritless in relation to that cause of action.  See Star‑Telegram,
915 S.W.2d at 473.  Because we conclude General has failed to prove the second
ground meritless, we need not reach the first.[5]








In relation to
General=s misappropriation
claim.  Apart from any written contract, an employee has a duty to
an employer not to use, in a manner adverse to the employer, confidential or
proprietary information acquired during the employment relationship.  See T‑N‑T
Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 21B22 (Tex. App.CHouston [1st
Dist.] 1998, pet. dism=d).  This duty survives termination of the
employment relationship and prevents the former employee=s use of
confidential information or trade secrets acquired during the course of his
employment.  Id. at 22.  Although, as in T-N-T Motorsports,
courts refer to Amisappropriation of confidential
information,@ there is no cause of action for misappropriation of
confidential information that is not either secret or at least substantially
secret.  Stewart & Stevenson Servs., Inc. v. Serv‑Tech, Inc.,
879 S.W.2d 89, 99 (Tex. App.CHouston [14th Dist.] 1994, writ denied); see
SP Midtown, Ltd.
v. Urban Storage, L.P., No. 14-07-00717-CV, 2008 WL 1991747, at *5 n.5 (Tex. App.CHouston [14th Dist.] May 8, 2008,
pet. denied) (mem. op.) (stating same and citing Stewart & Stevenson
Servs., 879 S.W.2d at 99).

Courts have held pricing information to be
a trade secret in some circumstances.  See, e.g., Bertotti v. C.E.
Shepherd Co., 752 S.W.2d 648, 653B54 (Tex. App.CHouston [14th
Dist.] 1988, no writ) (upholding temporary injunction to enforce non-compete
covenant because company had legitimate interest in protecting product
information, including pricing); Rugen v. Interactive Bus. Sys., Inc.,
864 S.W.2d 548, 552 (Tex. App.CDallas 1993, no writ) (upholding grant of
temporary injunction when record contained evidence from which trial court
could have determined that information, including pricing information, company
sought to protect deserved trade-secret status).  As set forth above, courts
consider the following  factors in determining whether a trade secret exists:
(1) the extent to which persons outside the party=s business know
the information; (2) the extent to which employees and others within the
business know it; (3) the extent of measures the party took to guard the
secrecy of the information; (4) the value of the information to the business
and its competitors; (5) the amount of effort or money expended to develop the
information; and (6) the ease or difficulty with which the information could be
properly acquired or duplicated by others.  In re Lowe=s Cos., 134 S.W.3d at
878.








The summary-judgment proof showed the
following in relation to the six factors.  Even though pricing for an
individual customer appeared in the customer=s contract and
customers were not required to sign confidentiality agreements, one could infer
from Shirey=s testimony that customer-specific pricing was not
usually discussed (first and sixth factors).  General had, as its only policy,
practice, or procedure to protect the information, an Aunspoken rule@ the
customer-specific pricing information was to stay in-house and General required
its employees to sign a confidentiality agreement which specifically referred
to Aprice@ (third factor). 
General lost a job to a competitor when its bid was Awithin pennies@ of the competitor=s (fourth factor).








Even viewed in the light most favorable to
General, the preceding proof does not rise to the level at which courts have
concluded the information at issue was secret.[6] 
See, e.g.,  Sharma v. Vinmar Intern., Ltd., 231 S.W.3d
405, 425B26 (Tex. App.CHouston [14th
Dist.] 2007, no pet.) (concluding, when viewed in light most favorable to trial
court=s order, the
evidence supported each of six factors and trial court=s determination
appellee possessed trade secrets because there was: (1) evidence appellee possessed
information not known outside its business, including appellee=s sale and
purchase histories that provided appellee with trend information about
customers= demands and their suppliers= product
inventory; (2) evidence appellee made concerted effort to maintain secret
nature of its information, including controlled access cards to enter appellee=s offices,
password protection of computers, confidentiality agreements executed by
employees as condition of employment, employee manuals emphasizing confidential
nature of appellee=s business, and limitation of access to appellee=s trade-secret
information on need‑to‑know basis to extent appellee=s traders were not
allowed to look at each other=s files; (3) evidence appellee possessed
trade-secret information impossible for someone outside appellee to properly
acquire, including economics and margins to be realized in Russian isoprene
trade; (4) evidence appellee=s trade-secret information would be
difficult for outsiders to duplicate, including witness=s testimony that
appellant tried, and failed, to access the isoprene market on his own, and fact
competitor had been trying, unsuccessfully, for long period of time to access
the Russian isoprene market; (5) evidence appellee expended great amount of
time, effort, and money developing and maintaining the isoprene trade-secret
information; and (6) evidence of great value of trade secrets to appellee,
including evidence Russian isoprene alone earned appellee $5.5 million profit
in first five months of 2005); T-N-T Motorsports, 965 S.W.2d at 22B23 (concluding, in
temporary injunction case, that specific means of upgrading motor vehicles was
trade secret when (1) information was not common knowledge, (2) appellee had
obtained information through years of trial and error and spent substantial amount
of time and money developing upgrade packages that would fit exact needs of its
clientele, (3) component parts used by appellee in its upgrade packages were
confidential and many components were not available but had to be built from
ground up, and (4) even appellee=s customers were
not told exact specifications of the work done on their vehicles);  Gonzales
v. Zamora, 791 S.W.2d 258, 265B66 (Tex. App.CCorpus Christi
1990, no writ) (upholding, in trade-secret action against former employees,
jury finding that employer=s indigent-patient-information-release
forms and its authorization forms were trade secrets when (1) former employer
spent substantial amount of time and money developing forms and spent time and
money having computer program developed to
facilitate business procedures, (2) computer program was protected by
nondisclosure clause in contract with computer programmer, (3) former employees
were asked to sign nondisclosure agreements and were therefore aware of former
employer=s desire for
confidentiality and desire to prevent competitors from using forms and
procedures, (4) one of former employer=s forms contained
clause restricting use of form to only former employer, and (5) forms were
provided by former employer for its own employees to use and there was no
access to forms except through former employer).








Instead, the summary-judgment proof in the
present case more closely approximates  evidence in cases in which the
information at issue was not considered a trade secret.  See, e.g.,
Creole Prod. Servs., Inc. v. Harper, 640 S.W.2d 727, 730 (Tex. App.CHouston [14th
Dist.] 1982, writ ref=d n.r.e.) (holding, in corporation=s suit based on
allegation former salesman appropriated corporation=s trade secrets,
jury=s failure to find
material appropriated by salesman constituted trade secrets was not against
great weight and preponderance of the evidence when evidence established the
following: (1) there was no writing on documents at issue themselves nor was
there a formal written policy indicating documents were considered confidential;
(2) some of material could be within common knowledge of trade or general
knowledge of industry; (3) some of information was disseminated to customers;
(4) some of documents bore logo of another company and several of Creole=s forms were very
similar to these; and (5) salesman may have had authorized access to many of
the documents during his employment); Numed, 724 S.W.2d at 435 (holding,
on appeal from denial of a temporary injunction, facts did not justify conferring
status of trade secret when evidence reflected much of information appellant
wished to protect was contained in contracts distributed to appellant=s customers, which
in turn, anyone might discover, and when employee had not signed a
confidentiality agreement).[7]








In short, the summary-judgment proof
established the customer-specific pricing information did not rise to the level
of a trade secret.

In relation to
General=s
breach-of-contract claim.  When we construe a contract
or agreement, our primary goal is to ascertain and give effect to the parties= intent as
expressed in the contract.   See Seagull Energy E
& P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006).  We
give contract terms their plain, ordinary, and generally accepted meanings unless the contract itself
shows the terms are used in a technical or different sense.  Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005).

The Agreement required an employee to hold
Ain strict
confidence@ information about Apractices,@ Amethodologies,@ Acosts (including
manufacturing costs),@ and Aprices.@  The Agreement
did not require an employee to keep confidential information Asuch as is
generally available through publication.@

In interpreting this provision, we are
guided by our previous decision in Allan J. Richardson & Associates,
Inc. v. Andrews, 718 S.W.2d 833 (Tex. App.CHouston [14th
Dist.] 1986, no writ).  In that case, a former employer argued the trial court
erred by refusing to enjoin former employees from disclosing confidential
information.  Id. at 836.  The employment contract, which was the basis
of the requested injunction, required an employee, during his employment and
for two years after, not to A>disclose to any
third person or party or use for his own benefit any trade secret or
confidential information.=@  Id.  The
former employer attempted to distinguish prior cases denying trade secret
status to the type of information in question.  Id. at 837.  The
employer argued these cases were distinguishable because they applied a common
law theory of unfair competition rather than a contractual prohibition on
disclosure.  Id.  This court rejected the argument and observed, AEven in the
vernacular the word secret implies that the information is not generally known
or readily available.@  Id.








The Agreement in the present case, by its
own terms, did not apply to information that was Agenerally
available through publication.@  In light of Allan J. Richardson,
we conclude the Agreement was not intended to apply to information that was not
a trade secret.  As discussed above, the summary-judgment proof established the
customer-specific pricing information was not a trade secret.  Thus, its
disclosure or use, if any, could not constitute a breach of the Agreement.

* * *

For the preceding reasons, overrule
General=s sole issue and
affirm the summary judgment.

 

 

/s/      Jeffrey
V. Brown

Justice

 

 

 

 

 

Panel consists of Justices Seymore, Brown, and Sullivan.          









[1]  King had counterclaimed for declaratory judgment. 
King and General filed cross-motions for summary judgment on King=s counterclaim.  The court denied King=s motion and granted General=s.  King has not appealed.





[2]  General=s
petition may be read as referring to general client and pricing information. 
On appeal, however, General relies on client-contact information (i.e., the
specific contact person within a business) and customer-specific pricing
information (i.e., specific prices quoted to individual clients).





[3]  General argues the affidavit did not meet the
criteria found in Rule 166a(c).  General=s
argument, however, relates to King=s
testimony regarding pricing, not customer contacts.





[4]  In arguing King=s
affidavit cannot support summary judgment in King=s favor, General also quotes a case from the Waco court of appeals for
the proposition that A[a] statement of an interested party, testifying as to
what he intended, is self‑serving, does not meet the standards for
summary judgment proof, and will not support a motion for summary judgment.@  Cornelison v. Newberry, 932 S.W.2d 729, 731
(Tex. App.CWaco 1996, no writ).  King=s affidavit testimony about the source of his customer
contacts was not a statement about what he intended.





[5]  As in his summary-judgment motion, King, in this
court, does not separately argue the import of the alleged lack of
confidentiality in relation to each of General=s causes of action and, other than referring to the term Aconfidentiality@ in
the Agreement, does not address the language of the Agreement.





[6]  Given the different burdens and standards of review
applicable to summary-judgment cases, as opposed to cases involving injunctive
relief, we acknowledge the difficulty of analogizing the latter to the present
summary-judgment case.  Nevertheless, we find cases involving injunctive relief
instructive for understanding what types of evidence will and will not support
the conclusion a trade secret exists.  We also  refer to cases involving jury
verdicts, again recognizing different standards apply to analysis of the
evidence.





[7]  General observes Numed was a case involving a
request for injunctive relief.  As noted above, we acknowledge that
difference.  General also cites Miller Paper Co. v. Roberts Paper Co.,
901 S.W.2d 593 (Tex. App.CAmarillo 1995, no writ).  In Miller Paper, the
court criticized Numed as misinterpreting state precedent to the extent
it refused to protect business data compiled by an employer but subject to
discovery through independent investigation.  Id. at 601 n.3.  In  Dannenbaum
v. Brummerhop, this court considered a jury instruction that tracked the Numed
approach.  840 S.W.2d 624, 631B33 (Tex. App.CHouston [14th Dist.] 1992, writ denied).  The Dannenbaum
court referred to two lines of Texas casesCone
in which courts analyze the difficulty in obtaining customer lists to determine
whether such lists are confidential information (the Numed line) and the
other in which courts focus on the method actually used to obtain the
information (the line of cases on which Miller Paper subsequently relied
to criticize Numed).  Id. at 632B33.  The Dannenbaum court observed: AThe instruction in this case essentially stated that
information one could readily obtain in the general industry could not be
appropriated as confidential.  Although Texas case law is conflicting, there is
authority supporting the statement included in this instruction.@  Id. at 633.   The court then concluded it
could not say the trial court submitted an improper instruction.  Id.